RIPPLE, Circuit Judge,
concurring in part and dissenting in part.
I join the majority’s resolution of Mr. Killian’s claim for statutory penalties, but I am unable to join the majority’s resolution of the remaining claims. Therefore, with great respect for the opinion of my colleagues, I concur in part and dissent in part.
A.
Mr. Killian claims that Mrs. Killian was entitled to benefits under the Royal Management Corporation Health Insurance Plan (the “Plan”). As the majority explains, we review a fiduciary’s decision to deny benefits under the abuse of discretion standard where, as here, the plan documents give the “fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.” Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S.Ct. 948, 108 L.Ed.2d 80 (1989). We have equated this standard with arbitrary-and-capricious review. Jackman Fin. Corp. v. Humana Ins. Co., 641 F.3d 860, 864 (7th Cir.2011). A fiduciary abuses its discretion if its determination lacks “rational support in the record.” Carter v. Pension Plan of A. Finkl & Sons Co. for Eligible Office Emps., 654 F.3d 719, 725 (7th Cir.2011).
Mr. Killian argues that Concert Health Plan Insurance Company (“CHPIC”), the Plan’s administrator for claims determinations and its ERISA claims review fiduciary, abused its discretion in two ways. He first asserts that CHPIC abused its discretion by determining that Mrs. Killian belonged to the PHCS Open Access network. He then claims that there is no rational support in the record for CHPIC’s conclusion that Mrs. Killian’s providers were out-of-network, no matter how we characterize the network to which Mrs. Killian belonged.[1]
I agree with my colleagues that CHPIC did not abuse its discretion in concluding that Mrs. Killian belonged to the PHCS Open Access network, and I join the majority’s analysis of that issue without reservation. However, I cannot agree with *766 the majority’s determination that there was rational support in the record for CHPIC’s determination that the providers in question were out-of-network. The majority acknowledges that there is no evidence in the record indicating whether these providers were part of the PHCS Open Access network. It follows that there is no rational support — indeed, there is not any support — in the record for CHPIC’s conclusion that the providers were out of Mrs. Killian’s network. We simply lack the record evidence necessary to address the question. I therefore favor remanding the issue to the district court so that CHPIC might supplement the record with the evidence it relied upon in concluding that the providers were out-of-network. CHPIC itself has consented to such a remand. See CHPIC Br. 12. I see no reason why we should not take it up on this offer.
Although my colleagues question whether such a remand is necessary, they permit one to accommodate my views. I am grateful for this accommodation and, in the remainder of this section, shall set forth the reason why I believe such a remand is appropriate.
The majority takes the view that we need not remand this claim because doing so would be a “useless formality.” See Schleibaum v. Kmart Corp., 158 F.3d 496, 503 (7th Cir.1998). I do not believe this principle has any application to the issue at hand. When the adequacy of an administrator’s denial letter is at issue, see 29 U.S.C. § 1133, the only remedy generally available is a remand to the administrator for a more substantial explanation. Schleibaum, 153 F.3d at 503. Such a remand is not required, however, if it would be a “useless formality.” Id. Here, the issue is not whether CHPIC adequately informed Mr. Killian of its reasons for denying Mrs. Killian’s claim, but whether CHPIC’s underlying factual determination has rational support in the record.[2] Mr. Killian does not contend that CHPIC failed to include certain required information in its denial letter; rather, he seeks a determination that the decision itself was arbitrary and capricious and that he is therefore entitled to benefits under 29 U.S.C. § 1132(a)(1)(B).[3]
This distinction is significant. ERISA’s specific notification requirements are designed to ensure that any beneficiary whose claim is denied has “an explanation of the denial of benefits that is adequate to ensure meaningful review of that denial” in further administrative proceedings and in federal court. Hatpin v. W.W. Grainger, Inc., 962 F.2d 685, 689 (7th Cir.1992). Mr. Killian now seeks judicial review of CHPIC’s substantive determination. That review focuses on whether CHPIC had some rational support for its conclusion. If the matter is as simple as CHPIC suggests, the district court should be able to resolve this issue with ease on remand.
B.
Mr. Killian also submits that Royal Management Corporation (“RMC”) and *767 CHPIC breached their fiduciary duties by failing to provide Mrs. Killian with a summary plan description (“SPD”) and by failing to inform him that Mrs. Killian’s providers were out-of-network during telephone conversations on April 7, 2006, respectively. While I rely on reasons different from those articulated by my colleagues, I agree that summary judgment was appropriate on the SPD issue. I believe, however, that we must remand the issue of the adequacy of CHPIC’s information on the status of Mrs. Killian’s providers. I shall discuss each of these issues in the following subsections.
1.
CHPIC and RMC are both fiduciaries under ERISA. Consequently, in fulfilling their duties to Mrs. Killian and other plan participants they must
discharge [their] duties ... solely in the interest of the participants and beneficiaries and ... with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.
29 U.S.C. § 1104(a)(1)(B). These duties are analogous to those of loyalty and care that are imposed upon a trustee under the common law. See Kenseth v. Dean Health Plan, Inc., 610 F.3d 452, 466 (7th Cir.2010). A beneficiary is entitled to relief for a breach of fiduciary duty if he proves “(1) that the defendant is a plan fiduciary; (2) that the defendant breached its fiduciary duty; and (3) that the breach resulted in harm to the plaintiff.” Id. at 464.
2.
Mr. Killian claims that RMC breached its fiduciary duty to Mrs. Killian by failing to provide her with an SPD, as required by 29 U.S.C. § 1021.[4] By regulation, each SPD must contain “a description of ... the composition of the provider network.” 29 C.F.R. § 2520.102 — 3(j)(3). We have explained that a fiduciary breaches its duty if it “fails to make the types of disclosures expressly required by the statute.” Mondry v. Am. Family Mut. Ins. Co., 557 F.3d 781, 808 (7th Cir.2009). The district court determined properly that Mrs. Killian never received an ERISA-compliant SPD. I therefore agree with the majority’s conclusion that RMC breached its fiduciary duty to Mrs. Killian in this regard. I also agree that the record does not support a conclusion that the Killians were harmed by this failure. However, my analysis of the causation question differs from that of the majority.
The majority concludes that RMC’s failure to produce an SPD did not harm Mrs. Killian by relying heavily on Mr. Killian’s testimony that his wife would have sought a second opinion from Dr. Bonomi “no matter what.” R.253 at 138-39. The Killians’ admission would preclude them from arguing that the absence of an SPD caused them to seek a second opinion from an out-of-network provider because they admitted that they would do so regardless of the physicians’ network status. However, a reasonable trier of fact still could conclude that Mrs. Killian would not have acquiesced to costly surgery by the providers if she had known that the providers were not in her network. Indeed, as I shall explain in further detail below, a reasonable trier of fact could conclude that Mr. Killian attempted to determine the surgery *768 providers’ network status shortly after learning that his wife required this prompt brain surgery. That Mrs. Killian was admitted to the hospital for this unexpected procedure before Mr. Killian contacted CHPIC does not preclude the distinct possibility that Mrs. Killian would have considered having another provider perform this unexpected surgery once she and Mr. Killian had been informed adequately that the contemplated providers were outside the network. Notably, Mr. Killian called the insurance company before the surgery, indicating that the Killians were concerned about whether the surgery would be covered by Mrs. Killian’s insurance. Consequently, I cannot join the majority’s analysis on this point.
I nevertheless believe that the majority’s result on this point should be sustained. Mr. Killian asserts that his wife incurred nearly $80,000 in out-of-network medical bills because RMC failed to provide Mrs. Killian with an SPD, which would have provided her with information about how she could ascertain that a certain provider was within the network. The record does not support this assertion. Mrs. Killian’s insurance card stated that she should call a specific number “to determine Provider participation.” R.82-7 at 2. Mr. Killian knew that he could call this number to determine a provider’s network status before Mrs. Killian became ill. R.253 at 31-32. Furthermore, Mrs. Killian received an “Enrollment Package” instructing her in multiple places to call the same number that was listed on her insuranee card to ensure that a provider is in-network. See R.259-5 at 8 (“Please always confirm with the network that the provider is still participating at the location you have chosen.”); id. at 10 (“The most accurate, up to date information can be found by calling the CHP dedicated line____” (emphasis in original)).[5] There is, therefore, no evidence that Mrs. Killian incurred these medical bills because she did not know how to determine whether they were in her network.
3.
Mr. Killian also claims that CHPIC breached its fiduciary duty to Mrs. Killian when it failed to inform him that the providers at Rush University Medical Center (“Rush”) were out of Mrs. Killian’s network during two phone calls on April 7, 2006. The majority opinion suggests that Mr. Killian may have waived this claim and then rejects the claim on the merits. In my view, CHPIC has waived this possible waiver, and Mr. Killian is entitled to further consideration of this claim before the district court.
a.
The majority notes that Mr. Killian may have waived any argument premised on these phone calls by failing to raise the issue in opposition to CHPIC’s motion for summary judgment. I agree that Mr. Killian’s responsive memorandum contains no discussion of this claim. See R.263.[6]
*769 Ordinarily, a litigant who fails to raise an argument in opposition to a properly raised motion for summary judgment will not be permitted to raise that same argument thereafter, either in a motion for reconsideration or on appeal. See Publishers Res., Inc. v. Walker-Davis Publ’ns, Inc., 762 F.2d 557, 561 (7th Cir.1985). However, a party waives the waiver by failing to assert it in this court.[7] That circumstance is present in this case. In its appellate brief, CHPIC asserts that Mr. Killian waived various arguments by not raising them before the district court.[8] It says nothing, however, about Mr. Killian waiving this particular argument. Instead, CHPIC argues that “[n]o efforts were made by Plaintiff or his wife to confirm whether any of these providers or treaters were within the network.” CHPIC Br. 10. It further claims that “nothing that [it] did or said in furnishing the information caused specific harm to the Plaintiff.” Id. By addressing the merits of this claim and failing to assert the possible waiver, CHPIC has waived Mr. Killian’s possible waiver.
The closest CHPIC comes to asserting this possible waiver on appeal is in the portion of its brief titled “Issues Presented for Review,” where it states: “It is unclear specifically how Plaintiff can present the issues presented in his appellate brief, as the issues presented in his appeal were never developed or argued at the District Court level.” CHPIC Br. 1-2. This statement is insufficient to raise the waiver point for several reasons. First, it appears only in the briefs statement of the issues, not in the section devoted to legal analysis. See Bob Willow Motors, Inc. v. Gen. Motors Corp., 872 F.2d 788, 795 (7th Cir.1989) (holding that an argument raised in one sentence of a briefs summary of argument with no citation to the record or the governing law is waived); see also Am. Int’l Enters., Inc. v. FDIC, 3 F.3d 1263, 1266 n. 5 (9th Cir.1993) (holding arguments raised only in a “Statement of Issues” are waived); cf. United States v. Kumpf, 438 F.3d 785, 791 (7th Cir.2006) (explaining that a party does not raise adequately an issue on appeal by merely listing it in the statement of issues). Even if CHPIC could raise adequately an argument by listing it in the issue statement, it cannot do so with a one-sentence statement devoid of any citation to the record or governing law. See Clarett v. Roberts, 657 F.3d 664, 674 (7th Cir.2011); Perry v. Sullivan, 207 F.3d 379, 383 (7th Cir.2000).[9] *770 For these reasons, I believe that it is appropriate to address the merits of this claim despite the possible waiver.
b.
With respect to the merits of this argument, we have recognized that “ ‘once an ERISA beneficiary has requested information from an ERISA fiduciary who is aware of the beneficiary’s status and situation, the fiduciary has an obligation to convey complete and accurate information material to the beneficiary’s circumstance, even if that requires conveying information about which the beneficiary did not specifically inquire.’ ” Kenseth, 610 F.3d at 466 (alteration omitted) (emphasis in original) (quoting Gregg v. Transp. Workers of Am. Int’l, 343 F.3d 833, 845-46 (6th Cir.2003)). “Regardless of the precision of his questions, once a beneficiary makes known his predicament, the fiduciary is ‘under a duty to communicate ... all material facts in connection with the transaction which the trustee knows or should know.’ ” Id. at 467 (alteration in original) (quoting Restatement (Second) of Trusts § 173, cmt. d (1959)). If a fiduciary “supplies] participants and beneficiaries with plan documents that are silent or ambiguous on a recurring topic, the fiduciary exposes itself to liability for the mistakes that plan representatives might make in answering questions on that subject.” Id. at 472. If, however, “the plan documents are clear and the fiduciary has exercised appropriate oversight over what its agents advise plan participants and beneficiaries, the fiduciary will not be held liable simply because a ministerial, non-fiduciary agent has given incomplete or mistaken advice to an insured.” Id.
i.
My colleagues conclude that the plan documents were clear. However, the Master Group Policy did not set out which providers were in the PHCS Open Access network. Instead, beneficiaries were instructed to “call the number listed on the back of [their] medical identification card[s]” to determine whether a provider was in-network. R.259-3 at 15. This is much like Kenseth, where “[t]he one and only course of action [the policy documents] advised the reader in terms of seeking additional information as to whether a particular course of treatment was covered by the [relevant] plan was to call [the fiduciary]’s customer service line.” 610 F.3d at 477. The majority reasons that because the Master Group Policy provided “clear instructions by which [the Killians] could have determined whether [the providers] were within the PHCS Open Access network,” the plan documents were sufficiently clear. Majority Op. 761. Kenseth, however, makes clear that a fiduciary cannot satisfy its broad fiduciary duty of disclosure solely by instructing beneficiaries to call and ask for the material information they are seeking. See 610 F.3d at 479.
Here, “[t]he [Master Group Policy] encouraged participants to contact [CHPIC] before undergoing treatment to determine whether the treatment would be [in-network], and that is exactly what [Mr. Killian] did.” Id. at 477. I would therefore conclude that CHPIC “expose[d] itself to liability for the mistakes that [its] representatives might make in answering [Mr. Killian’s] questions on that subject.” Id. at 472.
ii.
I further believe that a reasonable trier of fact could conclude that CHPIC was *771 aware (or, at the very least, that it should have been aware) that Mr. Killian was attempting to determine whether the physicians who were about to perform surgery on Mrs. Killian at Rush were within Mrs. Killian’s network. The front of Mrs. Killian’s insurance card provides two phone numbers. The first of the two numbers is for “determin[ing] Provider participation.” R.82-7 at 2. This was a “dedicated line” for providing “[t]he most accurate, up to date information” regarding provider participation. R.259-5 at 10 (emphasis in original). Because this line was dedicated to informing beneficiaries whether providers were in-network, CHPIC knew (or, at the very least, should have known) that beneficiaries would call this line to determine a provider’s network status. Mr. Killian called this number on April 7, 2006. After providing Mrs. Killian’s name and card number, he said, “we are here for a second opinion and she is going — they want to admit her because we already determined the tumor has to come off.” R.253 at 72; see also id. at 125 (“I said she was being admitted to the hospital and they were going to do the [brain] surgery.”). Mr. Killian referred to Rush as “St. Luke’s,” the name that he had always used for this hospital. Id. at 72.[10] The CHPIC representative said that she was unable to find a listing under that name and instructed Mr. Killian to “[g]ive [her] a call back.” Id. She also said that Mrs. Killian should “go ahead with whatever had to be done.” Id. at 125. Although the representative did not directly state that Rush was in Mrs. Killian’s network, a reasonable trier of fact could conclude that this representative failed “ ‘to convey complete and accurate information material to [Mrs. Killian]’s circumstance.’ ” See Kenseth, 610 F.3d at 466 (citation omitted). My colleagues rely heavily on Mr. Killian’s testimony that he and the agent “never determined anything” during this phone call in concluding that Mr. Killian “did not take her at her word.” Majority Op. 760. However, Mr. Killian also testified that he believed that Mrs. Killian’s surgery would be covered “[b]ecause nobody ever said these are out-of-network.” R.253 at 136. Taking these facts in the light most favorable to Mr. Killian for purposes of summary judgment, a reasonable trier of fact could conclude: (1) that Mr. Killian was concerned about whether the providers were in-network; (2) that Mr. Killian called the number that Mrs. Killian’s insurance card said should be used to determine provider participation to resolve this question; (3) that the operator knew that Mr. Killian was seeking this information; (4) that the operator told Mr. Killian to “go ahead with whatever had to be done,” even though she knew that she had not been able to establish the provider’s network status; and (5) that Mr. Killian left that phone call believing that Mrs. Killian could “go ahead” with whatever had to be done because he had followed the instructions on Mrs. Killian’s insurance card, was told to do so and received no warning that the “go ahead” was not to be understood as an authorization.
Although the testimony upon which the majority relies might be read to suggest that Mr. Killian has come to realize in the years since this call occurred that the agent had not definitively authorized the treatment, the remainder of Mr. Killian’s testimony suggests that, during the stress of the moment, he believed that he could rely on the agent’s representation to “go *772 ahead.” Mr. Killian “should not be penalized because he failed to comprehend the technical difference between ‘[go ahead]’ and ‘[the provider is in-network].’ The same ignorance that precipitates the need for answers often limits the ability to ask precisely the right questions.” Kenseth, 610 F.3d at 467 (internal quotation marks omitted). At the very least, the agent should have instructed Mr. Killian that she was unable to locate an entry in her system for “St. Luke’s” and that she could make no representations at that time as to whether the provider was in-network.
The majority also reasons that Mr. Killian could not have relied on this instruction to “go ahead” because he later called the second number. However, Mr. Killian testified that, in making the second call, he was calling “for preadmission,” as he was instructed to by Mrs. Killian’s insurance card. R.253 at 74. The card said that “[e]mergency admissions must be certified within 48 hours” and that this second number should be used to obtain the necessary “UTILIZATION REVIEW.” R.82-7 at 3. Taking these facts in the light most favorable to Mr. Killian, a reasonable trier of fact could conclude that Mr. Killian made the second call to obtain the required “certification,” or “UTILIZATION REVIEW,” for his wife’s surgery. Having just learned that the surgical procedure was necessary for his wife to live longer than a few days, R.253 at 127-28, a reasonable trier of fact could conclude that Mr. Killian believed this was an emergency procedure for which he was not required to obtain precertification seven days in advance.[11]
When Mr. Killian made this second call, he dialed the second of two numbers on the front of Mrs. Killian’s insurance card, which was for customer service. As I have noted earlier, this was the same number that the instructions on the back of the card said should be used to certify admission. Thus, Mr. Killian did not “call [the first representative] back,” as she had instructed. However, at the summary judgment stage, Mr. Killian’s decision to call a different number is not fatal to his claim. There is evidence that CHPIC had encouraged beneficiaries to use this number for determining provider participation, as well. Specifically, in the Master Group Policy, CHPIC instructed beneficiaries that they “must call the number listed on the back of [their] medical identification card” in order “[t]o confirm that [a] ... provider is a CURRENT participant in [the beneficiary’s] provider Network.” R.259-3 at 15 (emphasis added). The back of Mrs. Killian’s insurance card provides two different phone numbers: the customer service number from the front of the card is provided twice; a vision benefits number is provided once. See R.82-7 at 3. Therefore, CHPIC should have known that beneficiaries such as Mr. Killian would be calling this line to determine whether certain providers were in their network.
Moreover, the second number that Mr. Killian called was the correct and apparently the only number that he could call to obtain the required certification review with respect to the particular surgical procedure that his wife was about to undergo. Given his earlier telephone conversation, a *773 reasonable trier of fact certainly could conclude that any further information as to whether the providers were in Mrs. Killian’s network would have been provided in the course of this conversation on authorizing the particular procedure.
Indeed, under these circumstances, CHPIC had an affirmative obligation to inform Mr. Killian that the providers Mrs. Killian was about to see were out-of-network. See Kenseth, 610 F.3d at 466 (“[T]he trustee ‘is under a duty to communicate to the beneficiary material facts affecting the interest of the beneficiary which he knows the beneficiary does not know and which the beneficiary needs to know for his protection in dealing with a third person.’ ” (citation omitted)). On this record, a rational trier of fact could conclude that this second operator was aware that Mr. Killian’s phone calls were an effort to confirm two points: (1) that the health care providers treating his wife were within the Plan’s network; and (2) that the particular procedures contemplated for her care were authorized by the Plan. In this second call, Mr. Killian stated: “I’m trying to get confirmation that we are going to be — my wife is going to be admitted to Rush.” R.253 at 73. The representative laughed and said, “Oh, you mean St. Luke’s,” as if she were speaking to a person sitting next to her. Id. The second representative then informed Mr. Killian that the hospital is known as “Rush Presbyterian.” Id. At some point, Mr. Killian said that “Susan is going to be admitted,” and the representative said “[o]kay.” Id. From her laughter and attempt at humor, a reasonable finder of fact well might conclude that this second representative knew something about Mr. Killian’s prior call. It would be reasonable to infer that this representative knew that Mr. Killian had attempted to determine whether “St. Luke’s” was in Mrs. Killian’s network in a prior call to the number for determining provider participation.
The majority asserts that ERISA does not require a fiduciary to set about on a “quest to uncover some kind of harm that might befall a beneficiary.” Majority Op. 760. This statement, however true as a general principle, hardly characterizes fairly this case. Given the broad fiduciary duties imposed by ERISA, an insurance company cannot defeat, as a matter of law, a breach-of-fiduciary-duty claim by asserting that it was unaware that an insured was seeking certain material plan information when, as in the circumstances presented here, the insured calls two different numbers that the insurance company itself established to provide the sort of information in question. This is particularly true when the representatives tell an insured to “go ahead with whatever ha[s] to be done” while knowing (or at least having reason to know) that the insured is confused about this aspect of his plan and is about to undergo a costly procedure that will not be fully covered.
The majority points out that “there is no evidence in the record to suggest that any ... failure on the representatives’ part was due to a lack of oversight by Concert.” Majority Op. 761. Assuming, arguendo, the truth of this assertion, I do not believe this conclusion entitles CHPIC to summary judgment at this stage. We have affirmed an entry of judgment against a plan administrator where the “plan documents ... failed to explain adequately” a particular provision and the lack of clarity “was then exacerbated by [the fiduciary’s agents] when [the beneficiary] inquired about her coverage.” Bowerman v. WalMart Stores, Inc., 226 F.3d 574, 591 (7th Cir.2000). In Kenseth, we read Bowerman to establish that “by supplying participants and beneficiaries with plan documents that are silent or ambiguous on a recurring *774 topic, the fiduciary exposes itself to liability for the mistakes that plan representatives might make in answering questions on that subject.” 610 F.3d at 472 (citing Bowerman, 226 F.3d at 591). Kenseth further indicated that the principle emerging from Bowermcm is “especially true when the fiduciary has not taken appropriate steps to make sure that ministerial employees will provide an insured with the complete and accurate information that is missing from the plan documents themselves.” Id. at 472 (emphasis added).
Regardless, CHPIC has not yet satisfied its initial burden on summary judgment of “showing] that there is no genuine dispute as to any material fact,” Fed.R.Civ.P. 56(a), as to the appropriateness of the steps it took to make sure that its ministerial employees provided insureds with the complete and accurate information that cannot be found in the plan documents themselves. If it ever does, Mr. Killian then would have the burden of coming forward with evidence to create a genuine fact issue on this point.[12]
iii.
If a beneficiary establishes that a fiduciary has breached its duty, ERISA authorizes injunctions and “other equitable relief.” See 29 U.S.C. § 1132(a)(3); Smith v. Med. Benefit Adm’rs Grp., Inc., 639 F.3d 277, 283 (7th Cir.2011). When reversing summary judgments, we frequently remand the actions to the district court so that the parties can give more attention to the remedial question.[13] That approach is particularly appropriate here. I would therefore remand this claim to the district court in order to afford Mr. Killian the opportunity to explain in greater detail why he believes he is entitled to equitable relief under § 1132(a)(3).
iv.
Today’s decision will have a significant impact on two levels. To the plaintiff, it deprives him of the protection of a federal statute designed specifically to ensure that benefits plan fiduciaries take the steps they would take if their own economic welfare was at stake. No reasonable plan fiduciary can maintain that he would have allowed himself to be treated as Mr. Killian maintains that he and his wife were treated during a time of great medical need. On a broader level, today’s holding suggests a departure from our long-standing view that ERISA’s incorporation of common law fiduciary standards brings to *775 federal benefits law the high degree of loyalty and care by which those ancient fiduciary principles have protected countless generations of English and American trust beneficiaries. See Kenseth, 610 F.3d at 466 (“This duty of course includes an obligation not to mislead a plan participant or to misrepresent the terms or administration of an employee benefit plan, including an insurance plan. But the duty is not limited to that negative command. It includes an affirmative obligation to communicate material facts affecting the interests of beneficiaries. This duty exists when a beneficiary asks fiduciaries for information, and even when he or she does not.” (citations omitted) (internal quotation marks omitted)); see also Bixler v. Cent. Pa. Teamsters Health & Welfare Fund, 12 F.3d 1292, 1300 (3d Cir.1993) (“Th[e] duty to inform is a constant thread in the relationship between beneficiary and trustee; it entails not only a negative duty not to misinform but also an affirmative duty to inform when the trustee knows that silence might be harmful”). Because I believe that today’s decision frustrates the manifest intent of Congress that Americans have such protection, I respectfully dissent from this part of the court’s holding.
Conclusion
For the foregoing reasons, I concur in part and dissent in part.

. As the majority explains, the district court did not address this later claim because it did not understand Mr. Killian to be "argu[ing] that CHPIC's decision was arbitrary or capricious on its merits.” R.289 at 14 n. 15. However, in opposing CHPIC’s first motion for summary judgment, Mr. Killian argued that CHPIC "has not presented any admissible evidence to support” its assertion that Mrs. Killian's providers were not in the PHCS Open Access network. R.86 at 12 (emphasis in original). He raised the same contention in opposition to CHPIC’s second motion for summary judgment. See R.263 at 8-9 ("CHPIC has submitted no evidence that Rush University, for example, is not part of the ... PHCS (Open Access) network____”). He reiterated this point in his motion for reconsideration. R.290 at 9. It is therefore clear that Mr. Killian raised this claim adequately.

. Although Mr. Killian did challenge the adequacy of CHPIC's denial letters in the district court, summary judgment was entered in favor of CHPIC on this claim. R.289 at 14-21. Mr. Killian has not appealed this determination, and it is accordingly not before us.

. The majority relies on Mr. Killian’s counsel’s statement that he "suspected” that CHPIC would determine that the providers were out-of-network, if the matter were remanded to it. Even if ERISA required that the matter be remanded to CHPIC for further explanation, and even if CHPIC deter mined that the providers were out-of-network,-as Mr. Killian's counsel suspects it would, Mr. Killian then would be entitled to challenge that determination as an abuse of discretion and to seek benefits under 29 U.S.C. § 1132(a)(1)(B).

. The record indicates that RMC was the Plan’s administrator. R.259-3 at 77. This designation brings with it the obligation of furnishing an SPD to the Plan’s participants. See 29 U.S.C. § 1021(a).

. Madonna Corbett, RMC’s Human Resources Director, explained that RMC’s business practice was to provide new enrollees in the Plan with this information. See R.259-2.

. Mr. Killian’s complaint does contain sufficient allegations to put CHPIC on notice of the claim. For instance, Mr. Killian alleged that he
called Concert Health Plan Insurance Company to confirm that Rush University was a network provider under the Concert Health Plan (or Royal Management Corp. Health Insurance Plan). Concert Health Plan Insurance Company informed Killian that Rush University was in the Concert Health Plan network or failed to inform Killian Rush University was not in the Concert *769 Health Plan network. Killian relied on these statements or omissions....
R.134 at 10 (setting out RMC’s alleged breaches of fiduciary duty); see also id. at 12 (incorporating this allegation against CHPIC). The complaint does not spell out how CHPIC violated ERISA in these phone calls. However, a plaintiff need not plead legal theories. Smith v. Med. Benefit Adm'rs Grp., Inc., 639 F.3d 277, 283 n. 2 (7th Cir.2011). Mr. Killian elaborated upon this claim in his motion for reconsideration. See R.290 at 1-5.

. See, e.g., Westefer v. Snyder, 422 F.3d 570, 584 n. 20 (7th Cir.2005); Riemer v. Illinois Dep't of Transp., 148 F.3d 800, 804-05 n. 4 (7th Cir.1998).

. CHPIC contends that Mr. Killian waived any argument that CHPIC’s benefit determination was not supported by rational support in the record. CHPIC Br. 11; accord id. at 13. Although CHPIC incorporates RMC’s arguments on the fiduciary duty claims by reference, see id. at 13, RMC similarly fails to raise the waiver noted by the majority. (While RMC does assert that Mr. Killian waived certain aspects of his statutory-penalties claim, RMC Br. 11, it says nothing about the waiver at issue.)

.Finally, to the extent CHPIC was referencing this precise waiver with its general statement, its argument is built upon a flawed premise. Although Mr. Killian may have raised this claim inadequately in the district court, it is incorrect to claim that this issue ”w[as] never developed or argued at the District Court level.” CHPIC Br. 1-2 (emphasis *770 added). As explained above, Mr. Killian described the factual basis for the claim in his complaint and called it to the district court’s attention in his motion for reconsideration.

. Rush University Medical Center adopted its current name in 2003. See History, Chicago Hospital Jobs at Rush University Medical Center, http://www.jobsatrush.com/history. htm (last visited Apr. 12, 2012). Before that, Rush's name incorporated the name of a predecessor entity, St. Luke’s. Id.

. I do not suggest that Mrs. Killian’s surgery was in fact an “emergency” for purposes of the policy. The parties have not addressed this point, and its resolution is therefore unnecessary at this stage. Nevertheless, some discussion of the issue is necessary for two reasons. First, it is important to determining what a rational trier of fact could make of Mr. Killian's phone calls on April 7, 2006. Second, the majority opinion appears to conclude that the Killians did not follow the pre-certification instructions on Mrs. Killian’s insurance card. See Majority Op. 761 n. 9. As my discussion of the point reveals, however, this conclusion is not compelled by the record.

. See Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ("Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.”); Logan v. Commercial Union Ins. Co., 96 F.3d 971, 979 (7th Cir.1996) ("Only after the movant has articulated with references to the record and to the law specific reasons why it believes there is no genuine issue of material fact must the nonmovant present evidence sufficient to demonstrate an issue for trial.”). Of course, in an ordinary case, we would hold that a litigant in Mr. Killian’s position waived this legal argument by failing to articulate it once CHPIC moved for summary judgment. See Teumer v. Gen. Motors Corp., 34 F.3d 542, 546 (7th Cir.1994). As explained above, however, CHPIC has failed to avail itself of the protections of our waiver rule. I would therefore conclude that this claim is alive and that the burden to establish a genuine issue of material fact on this point has yet to be placed properly upon Mr. Killian.

. See, e.g., Kenseth v. Dean Health Plan, Inc., 610 F.3d 452, 483 (7th Cir.2010) (remanding where the plaintiff "may be able to identify a form of equitable relief that is appropriate to the facts of this case”).